of Veterinary Sports Medicine and Rehabilitation, 2016. Mr. Lyons, when you're ready. May it please the court. It's our position in this case that the factual underpinnings of the TTAP decision are so riddled with factual errors so as to render the decision unsupported by substantial evidence. As a matter of fact, to uphold this decision, this court would have to abandon some very well-established principles regarding priority right and priority use in ownership proceedings. I have trouble with the basic proposition that you're raising, which is that someone involved in an organization can trademark the name of the organization which she has eventually left. She's adopted as a trademark the name of the organization with which she was working. Well, that's actually not the way it happened. And that gets to the first point, which has to do with priority of ownership being derivative of first use. The appellant in this case conceived and began to use in commerce for the first time the trademark, American College of Veterinary Sports Medicine and Rehabilitation, in 1995, which was years before she ever became associated, at least briefly, with this unincorporated group of association of veterinarians that ultimately would incorporate themselves using her misappropriated trade name. But when she first met with them, they were just five veterinarians. And prior to her meeting with them, for five years, she had already been using the name in commerce. And that's really the gravamen of our claim in this case, that she didn't. But there were facts found, were there not? Yes. By the board. Yes. That the parties never intended that she would own the mark and that the relevant public looks to the organization for support rather than to her. Those conclusions by the board were based upon completely erroneous findings of fact. The board got many factual, many of the factual basis for that conclusion completely wrong. Besides not paying any attention or disregarding all the evidence concerning priority of use, which I think really ends the analysis. But with respect to what Your Honor is referring to, all of that, those conclusions by the board were based upon a series of erroneous factual findings. Was its finding of her future plans as opposed to actual use erroneous? Yes. So Equine Excellence Initiative was something more than an occasional publication? Absolutely. And Your Honor, I think. Did she maintain a mailing list? Yes. She had a list of donors and contributors. She had students. She conducted seminars and clinical educational programs. Listen to my question. Yes, Your Honor. Did she maintain a mailing list? Because the board says she did not. She did not maintain a mailing list per se, although she conducted mailings. Did she maintain other documentation showing to whom she sent the publication? Yes, Your Honor. In the appendix beginning at 1713, there's a series of exemplar letters that she used to solicit funds and in which the Equine Excellence Initiative was included. And she testified that she had provided those solicitations to over 1,000 individuals before she had met this group of which she was briefly associated. And that gets to, I think, the erroneous factual underpinnings of the TTAB in this case. Did she, as of 2013, I guess, did she have a dedicated business location? Well, she operated out of her home. I guess you could say that's a dedicated business. But she had no permanent employees. She had no dedicated business center or an office. She had part-time students. She conducted business out of her home. But this court has consistently maintained that might does not make right. It doesn't matter how big her business organization is. The only thing that's important is that she has established the mark by using it in commerce. And that she can establish years before her association, her brief association with this group began. And it only lasted for 18 months. It was a total of three meetings, the last of which she wasn't able to participate in. But it lasted 18 months, three meetings. And during that entire time, nothing happened. One of the erroneous conclusions of the board here is that Dr. Lyons participated in some way in the preparation of this petition. But as I state in the briefs, they got that completely wrong by confusing this informal working group with an organization of 27 veterinarians, the official organizing committee, that would not come along until 2008, four years after her association, her brief association with this group of five veterinarians had ended. With respect to the five veterinarians, nothing happened. There were three meetings. There was no petition. The only thing that happened, there was a letter of intent sent to the AVMA expressing an intention to later file a petition. But as this court has consistently maintained, an expression of intent is not sufficient to establish ownership rights. And while she was doing this, before her association, during her association, after association, her association, she continued to fundraise. She continued to conduct seminars and clinical education programs. She continued to certify students, maintain websites, own domain names, and successfully raised more than $2 million. That's, in my book, a use in commerce. Before she had ever met these people, she had raised more than $510,000 in support for donations made to her organization in the name of her mark. But do I misunderstand? Is the trademark the name of the organization? The name of the organization is the trademark at issue? Yes. She had the mark, had been using the mark since 1996. She became associated with this group of veterinarians briefly. And then eight years later, they incorporate and misappropriate her trade name. But during that entire period of time, they did nothing. There was no use in commerce. There was no publications, no education programs, no fundraising, all of the things that she had been doing for 15 years up until this point. You told me that Dr. Lyons had issued certifications. Yes. I'm looking at 535 and 536 of the appendix at the bottom. Question, do you currently have, and when I say you, I mean Homecoming Farm, does Homecoming Farm currently have any certification programs that are already in place and operating? We don't answer. We don't have any certification programs. Is that like apples and oranges? Well, yes, I think it is apples and oranges. She does not certify veterinarians in the same way that this college does, which works under the auspices of the AVMA. So what are the certification programs? She certified veterinarians and paraprofessionals in the sport horse industry who had taken her examination and successfully completed her training programs with respect to these specific methodologies that she had developed. Where's that in the record? I know it's in the record, and I'll find it, Your Honor, because we did cite to it in our brief in chief. If you give me a moment, I'll find it. We can do it on rebuttal. I will find it for you, Your Honor. It's not the same type of certification, but it's still nevertheless conducting educational programs and training personnel. One of the distinctions, for instance, between her educational programs and the colleges is that she did certify paraprofessionals, farriers, and people who were not licensed veterinarians. Apparently there are a series of other American colleges, right? There are. When it comes to naming conventions, there's all kinds. Did they exist before Dr. Lyons appropriated the name, which she said was hers? Well, I don't think there's any reservation for American college. I mean, there's American College of Pediatrics, American College of Orthopedics. Yeah, but aren't there several veterinary American colleges? Sure. With respect to specialty organizations, which I think you're talking about, and the naming conventions that are used for that, oftentimes they do use the term American college, and as Dr. Sabin, the representative from the AVMA, testified, oftentimes they do not. Sometimes they call themselves boards. Sometimes they call themselves colleges. Sometimes they don't use college or board. There's no magic with the words American college that enables the AVMA to reserve that exclusively to the use of its members who happen to seek its approval for a VSO. The American college can be used by anybody who uses it first and who actually engages in commerce with the use of the name. But as Sabin testified, not everybody that the AVMA certifies uses the convention American college. I understand the decision below to be focusing on kind of the point you're making right now, which is that it's not just use that it's not. You have to show that there's this secondary meaning and it's connected to your client's business. I think that the decision below was that had not been established. So how do you show, how do you respond to that? That is one of the more troubling parts of the decision below, because what it offered up is several cases by the TTAB and this article that had been written by an individual. And in looking at the rationale offered, and that it was basically that the decision should not be based upon who was first to use, but when it came to a mark on the supplemental register that happens to be a service mark, then it has to establish secondary meaning. That I read as inconsistent with this court's holding and other circuits holding that the way you determine priority, the way you determine ownership is through priority use and through appropriation. And to that, the appellant offered evidence that the mark had achieved secondary meaning. But the reason I say it's troubling is because the board decided that prior appropriation, continuous use for 20 years, $2 million in public support, the publication of educational materials, conducting educational clinics and seminars. Where are you reading from? I'm reading from essentially my notes. Oh, okay. I was wondering if you were reading from the decision, because I don't see it addressing all of that at all. This is my critique of the decision. You're saying there's lots of things on the record that just aren't in the... There's lots of things on the record that... We're supposed to look at substantial evidence. I mean, we're supposed to look at the fact findings and determine whether there's substantial evidence to support the findings made, not whether there's evidence to support contrary findings. No, obviously not. And when this board, excuse me, when this court looks at a case applying the substantial evidence standard, as it's stated in Online and A.C. Archiman, you look at the totality of the evidence and you ask whether or not a reasonable person would conclude what the board had concluded. And where the factual underpinnings of the board's decision are so riddled with errors, then there is a lack of substantial evidence in this case. And what I've tried to do in this brief is take you through almost the entire alphabet, pointing out the factual errors that the board bases its decision on in this case. And there are very basic fundamental factual errors in this case that the board has made involving the calculation. You're basically through your rebuttal time. Why don't we say give you two minutes back for rebuttal? That's more than generous, Your Honor. Thank you. Thank you. Thank you, Your Honor. May it please the Court. My name is David Cluft. I represent the APALY, the American College of Veterinary Sports Medicine and Rehabilitation. The college is a veterinary specialty organization that educates and certifies professionals that have already achieved a veterinary degree in an additional specialty, in this case, specifically the treatment of high-performance and athletic animals. But Dr. Lyons claims she used the name first in commerce. The TTAB found that she did not use the name first in commerce. The evidence that she has of her use of the name prior to her association with my client is evidence of private correspondents discussing a project that she hopes one day to complete. The testimony by Dr. Lyons is that her intention at the time was that in adopting this name, someday she would seek recognition for an organization called the American College of Veterinary Sports Medicine and Rehabilitation by the AVMA as a veterinary specialty organization. That is what she proceeded to do. You see in the Equine Excellence Initiative the document from 1996, which is a single-space typewritten document with no logos, no adornment, and no evidence on record of to whom it was sent, except a couple affidavits suggesting that it was from some people saying that at some unspecified point in time they received it. But I'm getting away from the point. The point is that the evidence is that Dr. Lyons' intention, and that's one of the ownership factors the TTAB looked at, what the expectations of the parties were. The expectation of Dr. Lyons, as evidenced by the record, was that in using this name, and we assume for purposes of the proceedings below that she was the first person to write it down on paper. That's the nature of organizations. Whenever you have an organization, probably somebody wrote, a person wrote the name down on paper before the organization was founded and started to operate. So that's perfectly to be accepted. So we accept it for purposes below that she was the first person to write it on paper. But why did she write it on paper? Well, she testified that the idea was she was working towards a goal, and that goal was recognition of this specialty by the American Veterinary Medical Association, which is the premier veterinary organization in the country. Her further actions show, after she got together with my clients, show additional indicia that she intended for my client, the American College of Veterinary Sports Medicine and Rehabilitation, to own the mark. She called the AVMA and said, how do I start a veterinary specialty organization called the American College of Veterinary Sports Medicine and Rehabilitation? And they said, well, you can't do it alone. And this is on the record in the testimony of Dr. Sabin. She called, I'm sorry, not in the testimony of Dr. Sabin, in the testimony of Dr. Lyons. She called the AVMA, and they told her you need at least six veterinarians, and you're an equine veterinarian, so some of them have to be canine, because that's going to be an important part, and you have to form an organizing committee. That's what she did. She formed the organizing committee. When she formed the organizing committee, as the TTAB found, one of the first steps is to send a letter of intent, which is a letter that has all the names and resumes of the organizing committee, plus their intention to found a new specialty organization. That's what they did. She sent a letter in with the other five veterinarians, and she testified that she consented to that, to having that sent in, that said, you know, I, Sheila Lyons, and I, Dr. Robert Gillette, and I, Dr. Hillary Clayton, and all these doctors, we together want to form an organization called the American College of Veterinary Sports Medicine and Rehabilitation. I'm sorry, Your Honors, it's hard to get through that many times fast. And we wanted to seek recognition for that organization from the AVMA. She testified, as the TTAB found, that she consented to that, to having her name in that letter and to that letter using that name. So even if she had in her mind the idea that this was hers or somehow she owned it, that's not what the manifest evidence on the record shows. After the letter of intent was accepted, Your Honors, she continued to act on behalf of the organization. She was tasked, all the doctors were tasked with different tasks in starting to move towards the next step in the process, which was a petition. She was tasked with drafting the first draft of the bylaws. And in order to do that, she phoned Dr. Elizabeth Sabin, whose testimony is on the record in this case, and Dr. Sabin testified that she got a call from the appellant, and the appellant said that, I am Dr. Sheila Lyons. I'm calling on behalf of the American College of Veterinary Sports Medicine and Rehabilitation, and I'm on the organizing committee, seeking recognition from the AVMA. Please give me a copy of the bylaws, and that's how that happened. So you see on the record evidence of the party's intent that this would be the name of an organization. And, of course, the other evidence that Your Honor pointed to is that there is an over 50-year history of a naming convention here, which is that the very first veterinary specialty organization was the American College of Veterinary Pathologists, founded in 1950. And since then, there's been about 20 or so different veterinary specialty organizations recognized by the AVMA. All of them have similar names. Over half of them start with American College of Veterinary. So that's why the TTAB found that the very name, American College of Veterinary Sports Medicine and Rehabilitation, carries with it in the relevant community the idea of a seal of approval from the AVMA. In any event, she entered into a crowded field. Well, that's true. And, Your Honor, we're not here to dispute the descriptiveness of the mark. The mark is ungainly. It's descriptive. And as I evidenced myself, difficult for a non-veterinarian to get through. But the issue here is not descriptiveness. It's not even secondary meaning. It's ownership. And the ownership factors are the expectations of the parties, to whom the public is looking to in association with the mark, and to who the public looks to to stand behind the mark. Now, the record has evidence on it of two public-facing events involving Dr. Lyons before she was dismissed from the college. And those events are telling of what was actually happening whenever she had a public event before she was dismissed. The first event on the record is this conference in 1999 when she met Dr. Gillette. And, by the way, Dr. Gillette, who was with Dr. Lyons, were the original two members, stayed on and became the chair and then the first president of the organization. So the suggestion that there's not a continuity there is just not borne out by the record. When she met Dr. Gillette at this conference in Oregon, we have Dr. Gillette's testimony on the record, and we also have the catalog from the conference on the record. And you can see from those two pieces of evidence that Dr. Lyons did not hold herself out as, I have this separate organization called the American College of Veterinary Sports Medicine Rehabilitation that's mine. It says, I'm Dr. Sheila Lyons from Homecoming Farm. And Dr. Gillette also testified that when she introduced herself to him for the purpose of finding a canine veterinarian partner for this organization, she also represented herself not as from an existing organization but from Homecoming Farms and the ideas to get together and found this organization. The second event that is on the record that shows any kind of public event involving the appellant is in 2004, and that is the event that happened in Cape Cod. There was a talk at which the appellant talked about certain equine veterinarian issues. I'm sorry, I'm looking for the page in my notes, and I'm not finding them. That sounds right. There was an event in Cape Cod in which she gave a talk and raised money, and at that she was raising money in part for what she called the American College of Veterinary Sports Medicine and Rehabilitation. So the question then is, well, okay, which one did she mean? Did she mean that this was the separate organization, or does this mean my client? Well, we have that answer because on the record she testified in the proceeding below at Appendix 714. I'm sorry, this is not the proceeding below. I correct myself. In the District of Massachusetts proceeding, she made a different argument, which is that at that event she was raising money for my client to pay for secretarial services that were necessary to go through the AVMA process. So clearly, even when Dr. Lyons faced the public in any way, it was, if at all, as a representative of my client. Now, it turns out that my client didn't want her to be fundraising, and that's one of the reasons that she was dismissed from the organization, but that issue's not before the court. There's one item I want to make sure— Has the Massachusetts proceeding concluded? The Massachusetts proceeding was concluded. The parties engaged in what Judge Young there called a case-stated trial, which is similar to the accelerated case resolution proceeding at the TTAB, where the summary judgment paper served as the trial record. Mr. Lyons and I then did oral arguments in front of Judge Young, and then he issued an opinion in 2014. There were multiple issues in that case, but the main issue was whether or not to refuse Dr. Lyons' attempt to register the mark on the principal register, so not the registration at issue here. That was in the case, but the principal issue was that was the principal register mark, and then also a copyright claim and also a trademark infringement claim. So my client prevailed on all of the claims, except the judge didn't act on the supplemental register mark, and the parties entered into—frankly, his opinion was somewhat ambiguous on the supplemental register mark, so the parties entered into a settlement agreement, which stated that Judge Young's opinion was not preclusive either way as to the supplemental mark, and the parties would proceed to the TTAB, and that's what they did. As I said, I would like to make sure I correct one thing for the record. In the briefs, although Mr. Lyons didn't mention it today, there's a suggestion that the letter of intent in 2003 had somehow expired because the petition— so in other words, the organizing committee does a letter of intent, and once the letter of intent is accepted by the AVMA, they then go on to a full petition, and there's a suggestion in the brief a couple times that the letter of intent expired because the petition wasn't filed within four years. Now, I'm not sure if he's right about that. I'm not sure where that gets him, but he's not right. The rule that he's citing, which is on Appendix 149, is the June 2011 rule, which does indeed include a four-year limitation, but the parties at the time were operating under the 2003 rules of the AVMA because this was 2003, and that's at Appendix 605, specifically the bottom of 613 and the top of 614, where you'll see that the four-year limitation is not there. So even by the AVMA's—I'm not sure it would matter for trademark purposes, but we did not violate the AVMA's rules either. Your Honors, I'd also like to point out that on a very important point, the TTAB also ruled in favor of the college. The TTAB looked to who the relevant public is going to expect to stand behind the services that are offered in association with the mark, and it's clear that my client has over 140 veterinarians that are out there offering services under the mark, and the very name itself, as they said, also implies that there's an association with the AVMA and that this is a going concern and a veterinary specialty organization. Importantly, we don't have to speculate about who the public will look to to stand behind the mark because it's on the record. When the Cape Cod— What is the status of your client's use of the mark right now? My client's been using the mark—I'm sorry, Your Honor, are you talking about use or registration? Use. My client uses the mark on its webpage. It uses the mark to certify veterinarians. It uses the mark in conjunction with annual conferences, which are sponsored by Purina and Nutramax. It uses the mark on the AVMA website as the reference source for the general veterinary public to look to. You say your client uses the mark. Is it registered? No, Your Honor. We have an application to register the mark on the principal register, and that application has been suspended pending the outcome of these proceedings. My client was made up of purely veterinarians. They did not think to register a mark at first in 2004, and when Dr. Lyons was dismissed from the organization, she registered the mark on the supplemental register, so it wasn't published for— Do all the other colleges have registered marks? I think about half of them do. I could be wrong. I mean, that's a matter of public record, but the only reason I know that is when sometimes I'm looking up my client's mark, I type in the wrong thing and up come the other marks, but there are a few of them on there, and I know one of them is the American College of Veterinary Surgeons, which is another AVMA-recognized veterinary specialty organization with which my client conducts an annual conference. Your Honor, for all the reasons that I stated, I would ask that the court affirm the decision of the TTAB. There's adequate and substantial and, indeed, overwhelming evidence to support it, and as the TTAB found, it will accrue to the benefit of the veterinary public and the public in general for the right party to be the registered owner of the mark. Thank you very much. Thank you. Mr. Clark. Mr. Lyons has just very brief couple of minutes. May I have a couple of questions? Yes, Your Honor. In the red brief, well, I'm looking at the appendix 686, 687, which is a part of the submission to the college and deals with the resume of Dr. Lyons, and it says she has a Ph.D. The red brief says that she does not have a Ph.D. It also says that she claims to have participated in an academic fellowship in human medicine, and I read that testimony closely. Yes. But there doesn't seem to be any documentation on that. So tell me one. Does she have a Ph.D.? No. Okay. That's a common appellation and a common mistake that's made with respect to designating veterinarians. Veterinarians, for instance, in England are referred to as Ph.D.s. In the United States, it's a DVM. This resume that was put together was not put together by Dr. Lyons, and she never represented or held herself out as having a Ph.D. As I said, it was an era which may have an innocent cause, but it had nothing to do with her misrepresenting her credentials. It's something that's commonly done with veterinarians. And on her testimony about her fellowship, it was fuzzy, to say the least. Well, she testified that she had. . . For instance, that she didn't have any kind of credentials for the hospital and so on. That's right. At the time that that fellowship program was conducted at New England Baptist Hospital under an orthopedic surgeon by the name of Lyle McHaley, there were no diplomas, certifications. She was one of the first to go through that program. What was the program? Where is it laid out? Because it doesn't appear in the record. It's not in the record. And there were no materials that we could obtain because it had happened so long ago in order to document the program. All they have is her testimony. But she testified very clearly. And the evidence is in the record in terms of how her veterinarian methodology was developed. It's all based upon the human model, which was. . . Last thing I would say, and I would only ask the Court to look at the letters and correspondence beginning on 1707 and going through 1842, which are the correspondence involving fundraising that was done long before Dr. Lyons ever met anyone associated with the college and the tax returns that document her successful fundraising activities, which we believe constitute a prior use, a prior commercial use of the mark, establishing a priority right. Thank you. Thank you, counsel. We'll take the case under advisement.